UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

CASE NO.: 6:14CV1105-ORL-37TBS

FEDERAL DEPOSIT INSURANCE CORPORATION
AS RECEIVER FOR INDYMAC BANK, F.S.B.,

    Plaintiff,

v.

ATTORNEYS TITLE INSURANCE FUND, INC., a
Florida corporation,

    Defendant.

_____/

# COMPLAINT

Plaintiff, the Federal Deposit Insurance Corporation as Receiver of IndyMac Bank, FSB ("FDIC-R" or "Plaintiff"), sues Defendant Attorneys Title Insurance Fund, Inc. ("ATIF" or "Defendant"), and alleges as follows:

## INTRODUCTION

1. This action is brought against ATIF for its breach of closing protection letters ("CPLs") it issued to IndyMac Bank, F.S.B. ("IndyMac"), in connection with two loan transactions for which Nate Hoskins, P.A. ("NHPA") was the closing/settlement agent.

2. Under the CPLs at issue, ATIF specifically agreed to reimburse IndyMac for actual loss incurred in connection with the closings when the loss arose out of NHPA's failure to follow IndyMac's closing instructions or NHPA's fraud or dishonesty in closing the transactions.

3. As set forth in more detail below, NHPA failed to comply with IndyMac's closing instructions and/or committed fraud and dishonesty in connection with the closings, entitling IndyMac to reimbursement under the CPLs issued by ATIF. In fact, Daniel Nathan Hoskins

1

("Nate Hoskins"), the principal of NHPA, pled guilty to conspiracy to commit bank fraud based upon the same type of scheme at issue in this case, and he is currently in federal prison.

4. ATIF has failed and refused to fulfill its duties and obligations in breach of the CPLs, proximately causing monetary injury to IndyMac. The FDIC as receiver for IndyMac files this action to recover its losses caused by ATIF's breaches.

## JURISDICTION AND VENUE

5. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 12 U.S.C. § 1819(b)(2)(A), because the FDIC-R is a party and therefore, this controversy arises under the laws of the United States.

6. Venue is proper in the Middle District of Florida under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this district, ATIF's principal place of business is in this district, the real properties underlying the transactions at issue are located in this district, and NHPA's offices were in this district.

## THE PARTIES

7. IndyMac was a federally chartered savings bank with its principal place of business in Pasadena, California.

8. The Federal Deposit Insurance Corporation ("FDIC") is a corporation and instrumentality of the United States of America, established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1835(a). On July 11, 2008, the Office of Thrift Supervision appointed the FDIC as Receiver for IndyMac. 12 U.S.C. § 1821(c). The FDIC-R is acting in its capacity as Receiver and is empowered to sue and complain in any court of law pursuant to 12 U.S.C. § 1819. Pursuant to 12 U.S.C. § 1821(d)(2)(A)(i), the FDIC-R, by operation of law, succeeded to all rights, titles, powers, and privileges of IndyMac and, among others, the depositors, accountholders, and stockholders of IndyMac. In this action, the FDIC-R seeks to recover damages resulting from the conduct of the Defendant. As Receiver, the FDIC-R is tasked with the obligation to recover losses incurred as a result of IndyMac's operations, including losses resulting because of loans funded by IndyMac.

9. Defendant ATIF is a Florida corporation, with its principal place of business in Orlando, Florida. At all relevant times, ATIF was engaged in the business of issuing title insurance policies and closing protection letters, among other things, and was doing business in Orange County, Florida.

10. NHPA was a closing/settlement agent who performed closing services on IndyMac loans. ATIF issued CPLs and title policies on certain loans closed by NHPA.

## COUNT I
## BREACH OF CONTRACT
### (The Ortiz Transaction)

11. Plaintiff realleges paragraphs 1 through 10, as if fully set forth herein.

12. On or about August 22, 2007, IndyMac funded a loan to borrower Afrael Ortiz ("Ortiz") in the amount of $337,500 (the "Ortiz Loan"), for the purchase of property located at 107 Vista Verdi Circle, Unit 209, Lake Mary, Florida (the "Ortiz Property"). Ortiz purchased the Ortiz Property from MUSA/ZMG Oakmonte LLC ("MUSA Realty").

13. NHPA agreed to serve as the closing/settlement agent for Ortiz's purchase of the Ortiz Property.

14. In agreeing to serve as the closing agent for the Ortiz Loan, NHPA agreed to abide by IndyMac's closing instructions, which include the Lender's Closing Instructions and the Addendum to Lender's Closing Instructions (the "Ortiz Closing Instructions").

15. The Ortiz Closing Instructions provided that NHPA was only authorized to act as directed by the Closing Instructions, stating in part:

> These are the lender's instructions to you for closing. You are directed to follow these instructions in full, at which time you may request funds. You are not authorized to close this transaction unless you can strictly comply with these instructions. These instructions can only be changed, modified or waived in writing and delivered or telecopied to you by an authorized agent of the lender.

16. Among other things, the Ortiz Closing Instructions required as follows:

3

> **INITIAL CLOSING INSTRUCTIONS: YOU ARE NOT AUTHORIZED TO CLOSE THIS LOAN IF: ...**
> 10. A transaction becomes known to you on or before the date of closing that involves the borrower(s) ... in the last 180 days. Notify the lender, in writing, of the additional transaction to verify that it has been considered in our loan approval decision.

17.  The Ortiz Closing Instructions further required:

> **CLOSING DOCUMENT REQUIREMENTS: ...**
> 24. Settlement Agent must notify us, in writing, if there are indications that funds to close or the earnest money deposit did not come from the Borrower.

18.  The Ortiz Closing Instructions further required as follows:
> **INDYMAC CONDITIONS: ...**
> 24. **Final signed HUD-1 ... must be approved prior to disbursement.** ...

19.  NHPA executed the Closing Instructions and certified its compliance with all of the conditions outlined in the Closing Instructions. For example, the Closing Instructions provided:

> **... CLOSING AGENT HEREBY CONFIRMS THAT ALL FUNDS RECEIVED FROM LENDER FOR DISBURSEMENT OF THE REFERENCED LOAN(S) WILL BE ... DISBURSED IN ACCORDANCE WITH THE LENDER'S INSTRUCTIONS HEREIN.**
>
> SETTLEMENT AGENT AGREES TO CLOSE THIS LOAN IN ACCORDANCE WITH ALL OF THE INSTRUCTIONS.

20.  Ortiz purportedly purchased the Ortiz Property for $375,000 financed in part by the Ortiz Loan.

21.  On his loan application for the Ortiz Loan, Ortiz claimed that the Ortiz Property would serve as his primary residence.

22.  IndyMac approved the Ortiz Loan, which required Ortiz to pay no less than $40,505 as a down payment (the "Ortiz Down Payment"), at or before the closing of the Ortiz Loan.

23.  ATIF issued a title insurance policy and a CPL for the Ortiz Loan.

4

24. In the CPL for the Ortiz Loan (the "Ortiz CPL"), ATIF specifically agreed to reimburse IndyMac for actual loss incurred in connection with the closing of the Ortiz Loan when the loss arises out of NHPA's failure to follow the Ortiz Closing Instructions or NHPA's fraud or dishonesty in closing the transaction.

### NHPA's Violation of the Closing Instructions and Fraud and/or Dishonesty in Connection with the Ortiz Loan

25. Prior to receiving IndyMac's approval to disburse the Ortiz Loan funds, NHPA submitted a HUD-1 to IndyMac for IndyMac's approval. The HUD-1 provided to IndyMac for approval represented that NHPA would obtain a $40,505.21 down payment from Ortiz. Based at least in part on this representation, IndyMac approved the HUD-1 submitted by NHPA authorizing NHPA to proceed with the closing of the Ortiz Loan transaction.

26. Despite IndyMac's requirement that Ortiz pay no less than $40,505.21 as a down payment, and that these funds come from the borrower himself rather than a third party, NHPA failed to collect a cash-to-close down payment from Ortiz and proceeded to close the Ortiz Loan despite its awareness that Ortiz had not paid the Ortiz Down Payment himself.

27. Contrary to its representations to IndyMac that it would collect Ortiz's down payment prior to closing, at no time did NHPA receive any cash-due-to-close down payment from Ortiz in connection with the Ortiz Loan.

28. Instead, funds purporting to represent the Ortiz Down Payment were paid by MUSA Realty, the property seller.

29. More specifically, on August 23, 2007, NHPA received a wire transfer in the amount of $40,505.21 (the amount required for the Ortiz Down Payment) from MUSA Realty. Upon information and belief, NHPA knew that the Ortiz Down Payment originated from the property seller MUSA Realty, as evidenced by its actions in immediately wiring the proceeds from the Ortiz Loan back to the same MUSA Realty bank account from which the Ortiz Down Payment originated.

30. NHPA was aware that it had received the Ortiz Down Payment from MUSA Realty and not from Ortiz himself and thus, pursuant to the Ortiz Closing Instructions, NHPA was not authorized to close the Ortiz Loan without first notifying IndyMac. Nevertheless, NHPA proceeded to close the loan and disburse IndyMac's loan funds without authorization to do so and despite its obligations under the Ortiz Closing Instructions.

31. NHPA further violated the Ortiz Closing Instructions by closing the Ortiz Loan despite its knowledge of another transaction involving Ortiz occurring simultaneously with Ortiz's purchase of the Ortiz Property and by failing to notify IndyMac of that additional transaction.

32. More specifically, on or about August 17, 2007, Ortiz purchased another property in the same condominium development as the Ortiz Property, located at 107 Vista Verdi Circle Unit 237, Lake Mary, Florida (the "Ortiz Undisclosed Property"). Ortiz purchased the Ortiz Undisclosed Property from MUSA Realty (the "Ortiz Undisclosed Transaction").

33. Upon information and belief, in applying for a mortgage loan to fund the Ortiz Undisclosed Transaction, Ortiz represented that the Ortiz Undisclosed Property was to serve as his primary residence.

34. NHPA provided closing services with respect to the Ortiz Undisclosed Transaction, and NHPA was aware that Ortiz had represented that the Ortiz Undisclosed Property was to serve as his primary residence.

35. Upon information and belief, NHPA opened escrow on the Ortiz Loan and the Ortiz Undisclosed Transaction on the same day. Indeed, NHPA accepted two $1,000 checks, both dated June 28, 2007, from Afrael Ortiz: one check to open escrow for the Ortiz Loan and the other to open escrow for the Ortiz Undisclosed Transaction.

36. NHPA closed the Ortiz Undisclosed Transaction just five (5) days before NHPA closed the Ortiz Loan.

37. Having opened escrow for both the Ortiz Loan and the Ortiz Undisclosed Transaction on the same day, and having closed both the Ortiz Loan and the Ortiz Undisclosed

Transaction within five days of each other, NHPA was aware that Ortiz simultaneously purchased two separate properties financed in large part by two separate mortgages.

38. Despite NHPA's clear knowledge of the Ortiz Undisclosed Transaction, NHPA neither halted the closing of the Ortiz Loan nor notified IndyMac of the Ortiz Undisclosed Transaction. Instead, NHPA closed the Ortiz Loan in violation of the Closing Instructions and without authorization from IndyMac to do so.

39. Upon information and belief, Nate Hoskins pled guilty to conspiracy to commit wire fraud in connection with a mortgage fraud scheme involving the same condominium development where both the Ortiz Property and the Ortiz Undisclosed Property are located. Mr. Hoskins is currently serving a federal sentence for his involvement in this scheme.[1]

40. NHPA was the gatekeeper for the Ortiz Loan and was responsible for overseeing the closing of the Ortiz Loan transaction. Rather than fulfilling its duties as a closing agent, NHPA instead acted deliberately, knowingly, and/or was willfully blind to facts that would otherwise be obvious, and/or acted with reckless disregard for its duties as closing agent during the closing of the Ortiz Loan.

41. NHPA's misconduct led IndyMac to believe it was funding a loan to a legitimate borrower who had made a down payment from his own funds and who would use the Ortiz Property as his primary residence when, in fact, Ortiz was never a legitimate borrower in this transaction, nor had Ortiz ever made a down payment, nor had Ortiz ever intended to use the Ortiz Property as his primary residence.

42. At the time of the closing of the Ortiz Loan, IndyMac had a reasonable expectation that it would have (1) a *bona fide* mortgagor in Ortiz with the capacity and intent to make mortgage payments; (2) a valid first lien on the Ortiz Property; and (3) the right to seek recovery of a deficiency after foreclosure from the mortgagor Ortiz.

---

[1] *See, U.S. v. Hoskins*, No. 6:12-cr-197-Orl-28TBS (M.D. Fla. filed Aug. 9, 2012).

43. A borrower's satisfaction of his or her down payment obligation is critical to a lender, as is a borrower's intention to use the purchase property as his or her primary residence, because these factors provide assurance of a borrower's legitimacy as one who holds an equity investment in the property and who sincerely intends to make future payments on the loan. Further, when a borrower purchases multiple properties at once unbeknownst to the lender, the lender is unable to adequately evaluate the borrower's ability to satisfy his or her obligations under the mortgage loan.

44. Ortiz was a straw buyer in the transaction who provided no down payment, purchased another undisclosed property simultaneously with the Ortiz Property, and had no intention of making the Ortiz Property his primary residence. Since Ortiz would neither lose his own money nor his primary residence by defaulting on the Ortiz Loan, he had no personal incentive to pay his mortgage and, in fact, did default on the Ortiz Loan after making just four (4) payments. Without a *bona fide* mortgagor, the Ortiz Loan was set up to guarantee a default. NHPA's conduct during the closing caused IndyMac to fund a mortgage without a *bona fide* mortgagor, depriving IndyMac of the *bona fide* mortgagor for which it bargained.

### ATIF's Breach of Contract

45. Plaintiff sought reimbursement under the Ortiz CPL for its losses arising from the Ortiz Loan, but ATIF has refused and continues to refuse to indemnify Plaintiff for its losses under the Ortiz CPL.

46. The Ortiz CPL requires ATIF to reimburse actual losses incurred by IndyMac. The Ortiz CPL states in pertinent part as follows:

> Attorneys' Title Insurance Fund, Inc. ... hereby agrees to reimburse you for actual loss incurred by you in connection with such closings when conducted by [Nate Hoskins, P.A.], when such loss arises out of:
>
> > 1. Failure of [Nate Hoskins, P.A.] to comply with your written closing instructions to the extent that they relate to (a) the status of the title to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land, including the obtaining of

> documents and the disbursement of funds necessary to establish such claims or title or lien, or (b) the obtaining of any other document, specifically required by you, ... or (c) the collection and payment of funds due to you, or
>
> 2. Fraud or dishonesty of [Nate Hoskins, P.A.] in handling your funds or documents in connection with such closing.

47. Plaintiff has a right to reimbursement of the actual losses stated in this Complaint because they are covered under the Ortiz CPL.

48. NHPA, as ATIF's approved agent, failed to comply with the Ortiz Closing Instructions by, *inter alia*, failing to collect the borrower's required funds to close from the borrower himself, collecting the borrower's required funds to close from the property seller, submitting a false HUD-1 for IndyMac's approval, closing the Ortiz Loan despite its knowledge of another transaction involving the borrower which closed just five (5) days prior to the closing of the Ortiz Loan, failing to notify IndyMac of another transaction involving the borrower within the previous 180 days, and otherwise disguising the misuse of IndyMac's loan proceeds. Furthermore, NHPA, as ATIF's agent, acted fraudulently and/or dishonestly in handling IndyMac's funds and documents in connection with the closing of the Ortiz Loan.

49. ATIF materially breached the Ortiz CPL by not reimbursing Plaintiff for the actual losses incurred by Plaintiff as a result of NHPA's fraud and/or dishonesty and/or breach of the Closing Instructions, as set forth above.

50. As a direct and proximate result of these material breaches, Plaintiff has suffered damages, including a severely under-secured mortgage loan from which only a fraction of the Loan debt could be recovered through loss mitigation attempts.

WHEREFORE, Plaintiff, Federal Deposit Insurance Corporation as Receiver for IndyMac Bank, F.S.B. respectfully requests that the Court enter judgment in its favor awarding it damages, costs, attorney's fees, and such other relief this Court deems proper against Defendant ATIF.

<u>COUNT II</u>
BREACH OF CONTRACT
(The Peralta Transaction)

51. Plaintiff realleges paragraphs 1 through 10, as if fully set forth herein.

52. On or about August 22, 2007, IndyMac funded a loan to borrower Doris Maribel Peralta ("Peralta") in the amount of $391,500 (the "Peralta Loan"), for the purchase of property located at 168 Villa Di Este Terrace, Unit 204, Lake Mary, Florida (the "Peralta Property"). Peralta purchased the Peralta Property from MUSA Realty.

53. NHPA agreed to serve as the closing/settlement agent for Peralta's purchase of the Peralta Property.

54. In agreeing to serve as the closing agent for the Peralta Loan, NHPA agreed to abide by and comply with IndyMac's closing instructions, which include the Lender's Closing Instructions and the Addendum to Lender's Closing Instructions (the "Peralta Closing Instructions").

55. The Peralta Closing Instructions provided that NHPA was only authorized to act as directed by, and in strict compliance with, IndyMac's Closing Instructions, stating in part:

> These are the lender's instructions to you for closing. You are directed to follow these instructions in full, at which time you may request funds. You are not authorized to close this transaction unless you can strictly comply with these instructions. These instructions can only be changed, modified or waived in writing and delivered or telecopied to you by an authorized agent of the lender.

56. Among other things, the Peralta Closing Instructions provided as follows:

> **INITIAL CLOSING INSTRUCTIONS: YOU ARE NOT AUTHORIZED TO CLOSE THIS LOAN IF: ...**
>
> 10. A transaction becomes known to you on or before the date of closing that involves the borrower(s) ... in the last 180 days. Notify the lender, in writing, of the additional transaction to verify that it has been considered in our loan approval decision.

57. The Peralta Closing Instructions further required:
**CLOSING DOCUMENT REQUIREMENTS: ...**

24. Settlement Agent must notify us, in writing, if there are indications that funds to close or the earnest money deposit did not come from the Borrower.

58. The Peralta Closing Instructions further provided as follows:
**INDYMAC CONDITIONS: ...**
**25. Final signed HUD-1 ... must be approved prior to disbursement. ...**

59. NHPA executed the Closing Instructions and certified its compliance with all of the conditions outlined in the Closing Instructions. For example, the Closing Instructions provided:

> ... **CLOSING AGENT HERBY CONFIRMS THAT ALL FUNDS RECEIVED FROM LENDER FOR DISBURSEMENT OF THE REFERENCED LOAN(S) WILL BE ... DISBURSED IN ACCORDANCE WITH THE LENDER'S INSTRUCTIONS HEREIN.**
>
> SETTLEMENT AGENT AGREES TO CLOSE THIS LOAN IN ACCORDANCE WITH ALL OF THE INSTRUCTIONS.

60. Peralta purportedly purchased the Peralta Property for $435,000, financed in part by the Peralta Loan.

61. On her loan application for the Peralta Loan, Peralta claimed that the Peralta Property would serve as her primary residence.

62. IndyMac approved the Peralta Loan, which required Peralta to pay no less than $34,645 as a down payment (the "Peralta Down Payment"), at or before the closing of the Peralta Loan.

63. ATIF issued a title insurance policy and a CPL for the Peralta Loan.

64. In the CPL for the Peralta Loan (the "Peralta CPL"), ATIF agreed to reimburse IndyMac for actual loss incurred in connection with the closing of the Peralta Loan when the loss arises out of NHPA's failure to follow the Peralta Closing Instructions or NHPA's fraud or dishonesty in the transaction.

### NHPA's Violation of the Closing Instructions and Fraud and/or Dishonesty in Connection with the Peralta Loan

65. Prior to receiving IndyMac's approval to disburse the Peralta Loan funds, NHPA submitted a HUD-1 to IndyMac for IndyMac's approval. The HUD-1 provided to IndyMac for approval represented that NHPA would obtain a $34,645 down payment from Peralta. Based at least in part on this representation, IndyMac approved the HUD-1 submitted by NHPA authorizing NHPA to proceed with the closing of the Peralta Loan transaction.

66. Despite IndyMac's requirement that Peralta pay no less than $34,645 as a down payment, and that these funds come from the borrower herself rather than a third party, NHPA failed to collect a cash-to-close down payment from Peralta herself and proceeded to close the Peralta Loan despite knowing that Peralta had not paid the Peralta Down Payment herself.

67. Contrary to its representations to IndyMac that it would collect Peralta's down payment prior to closing, at no time did NHPA receive any cash-due-to-close down payment from Peralta in connection with the Peralta Loan.

68. Instead, funds purporting to represent the Peralta Down Payment were paid by MUSA Realty, the property seller.

69. More specifically, on August 27, 2007, NHPA received a wire transfer in the amount of $34,645 (the amount required for the Peralta Down Payment) from MUSA Realty. Upon information and belief, NHPA knew that the Peralta Down Payment originated from the property seller MUSA Realty, as evidenced by its actions in immediately wiring the proceeds from the Peralta Loan back to the same MUSA Realty bank account from which the Peralta Down Payment originated.

70. NHPA was aware that it had received the Peralta Down Payment from MUSA Realty and not from Peralta herself and, thus, pursuant to the Peralta Closing Instructions, NHPA was not authorized to close the Peralta Loan without first notifying IndyMac. Nevertheless, NHPA proceeded to close the loan and disburse IndyMac's loan funds without authorization to do so and despite its obligations under the Peralta Closing Instructions.

71. NHPA further violated the Peralta Closing Instructions by closing the Peralta Loan despite its knowledge of two other transactions involving Peralta occurring simultaneously with Peralta's purchase of the Peralta Property, and by failing to notify IndyMac of those additional transactions.

72. More specifically, on or about August 10, 2007, Peralta purchased another property in the same condominium development as the Peralta Property, located at 168 Villa Di Este Terrace, Unit 21-204, Lake Mary, Florida (the "First Peralta Undisclosed Property").

73. Peralta purchased the First Peralta Undisclosed Property from MUSA Realty for $430,000 ("First Peralta Undisclosed Transaction").

74. Upon information and belief, in applying for a mortgage loan to fund the First Peralta Undisclosed Transaction, Peralta represented that the First Peralta Undisclosed Property was to serve as her primary residence.

75. NHPA provided closing services for the First Peralta Undisclosed Transaction, which closed twelve (12) days before NHPA closed the Peralta Loan, and NHPA was aware that Peralta had represented that the First Peralta Undisclosed Property was to serve as her primary residence.

76. On August 31, 2007, Peralta purchased yet another property in the same condominium development as the Peralta Property, located at 180 Villa Di Este Terrace, Unit 21-104, Lake Mary, Florida (the "Second Peralta Undisclosed Property")

77. Peralta purchased the Second Peralta Undisclosed Property from MUSA Realty for $430,000 (the "Second Peralta Undisclosed Transaction").

78. Upon information and belief, in applying for a mortgage loan to fund the Second Peralta Undisclosed Transaction, Peralta represented that the Second Peralta Undisclosed Property was to serve as her primary residence.

79. NHPA provided closing services for the Second Peralta Undisclosed Transaction, which closed just nine (9) days after NHPA closed the Peralta Loan, and NHPA was aware that

Peralta had represented that the Second Peralta Undisclosed Property was to serve as her primary residence.

80. NHPA opened its escrow file on the Second Peralta Undisclosed Transaction prior to the closing of the Peralta Loan, and thus NHPA was aware of the existence of the Second Peralta Undisclosed Transaction prior to the closing of the Peralta Loan.

81. Having closed the Peralta Loan, the First Peralta Undisclosed Transaction, and the Second Peralta Undisclosed Transaction, all within twenty (20) days of each other, NHPA was aware that Peralta simultaneously purchased three separate properties, financed in large part by three separate mortgages.

82. Despite NHPA's clear knowledge of both the First Peralta Undisclosed Transaction and the Second Peralta Undisclosed Transaction, and the misrepresentations made by Peralta in further of obtaining mortgages to finance the Peralta Loan, NHPA neither halted the closing of the Peralta Loan nor notified IndyMac about either of the two additional Peralta transactions. Instead, NHPA closed the Peralta Loan in violation of the closing instructions and without authorization from IndyMac to do so.

83. Upon information and belief, Nate Hoskins pled guilty to conspiracy to commit wire fraud in connection with a mortgage fraud scheme involving the same condominium development where the Peralta Property, First Peralta Undisclosed Property, and Second Peralta Undisclosed Property are located. Mr. Hoskins is currently serving a federal sentence for his involvement in this scheme.

84. NHPA was the gatekeeper for the Peralta Loan and was responsible for overseeing the closing of the Peralta Loan transaction. Rather than fulfilling its duties as a closing agent, NHPA instead acted deliberately, knowingly, and/or was willfully blind to facts that would otherwise be obvious, and/or acted with reckless disregard for its duties as closing agent during the closing of the Peralta Loan.

85. NHPA's misconduct led IndyMac to believe it was funding a loan to a legitimate borrower who had made a down payment from her own funds and who would use the Peralta

Property as her primary residence when, in fact, Peralta was never a legitimate borrower in this transaction, nor had Peralta ever made a down payment, nor had Peralta ever intended to use the Peralta Property as her primary residence.

86. At the time of the closing of the Peralta Loan, IndyMac had a reasonable expectation that it would have (1) a *bona fide* mortgagor in Peralta with the capacity and intent to make mortgage payments; (2) a valid first lien on the Peralta Property; and (3) the right to seek recovery of a deficiency after foreclosure from the mortgagor Peralta.

87. A borrower's satisfaction of his or her down payment obligation is critical to a lender, as is a borrower's intent to use the purchased property as his or her primary residence, because these factors provide assurance of a borrower's legitimacy as one who holds an equity investment in the property and who sincerely intends to make future payments on the loan. Further, when a borrower purchases multiple properties at once, unbeknownst to the lender, the lender is unable to adequately evaluate the borrower's ability to satisfy his or her obligations under the mortgage loan.

88. Peralta was a straw buyer in the transaction who provided no down payment, purchased two other undisclosed properties simultaneously with the Peralta Property, and had no intention of making the Peralta Property her primary residence. Since Peralta would neither lose her own money or her primary residence by defaulting on the Peralta Loan, she had no personal incentive to pay her mortgage and, in fact, did default on the Peralta Loan after making just four (4) payments. Without a *bona fide* mortgagor, the Peralta Loan was set up to guarantee a default. NHPA's conduct during the closing caused IndyMac to fund a mortgage without a *bona fide* mortgagor, depriving IndyMac of the *bona fide* mortgagor for which it bargained.

### ATIF's Breach of Contract

89. Plaintiff sought reimbursement under the Peralta CPL for its losses arising from the Peralta Loan, but ATIF has refused and continues to refuse to indemnify Plaintiff for its losses under the Peralta CPL.

90. The Peralta CPL requires ATIF to reimburse actual losses incurred by IndyMac. The Peralta CPL states in pertinent part as follows:

> Attorneys' Title Insurance Fund, Inc. . . . hereby agrees to reimburse you for actual *loss in*curred by you in connection with such closings when conducted by [Nate Hoskins, P.A.], when such loss arises out of:
>
> 1. Failure of [Nate Hoskins, P.A.] to comply with your written closing instructions to the extent that they relate to (a) the status *of the tit*le to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land, including the obtaining of documents and the disbursement of funds necessary to establish such claims or title or lien, or (b) the obtaining of any other document, specifically required by you, . . . or (c) the collection and payment of funds due to you, or
>
> 2. Fraud or dishonesty of [Nate Hoskins, P.A.] in handling your funds or documents in connection with such closing.

91. Plaintiff has a right to reimbursement of its actual losses stated in this Complaint because they are covered under the Peralta CPL.

92. NHPA, as ATIF's approved agent, failed to comply with the Peralta Closing Instructions by, *inter alia*, failing to collect the borrower's required funds to close from the borrower herself, collecting the borrower's required funds to close from the property seller, submitting a false HUD-1 for IndyMac's approval, closing the Peralta Loan despite its knowledge of two additional transactions involving the borrower which closed immediately before and immediately after the Peralta Loan closed, failing to notify IndyMac of two additional transactions involving the borrower within the previous 180 days, and otherwise disguising the misuse of IndyMac's loan proceeds. Furthermore, NHPA, as ATIF's agent, acted fraudulently and/or dishonestly in handling IndyMac's funds and documents in connection with the closing of the Peralta Loan.

93. ATIF materially breached the Peralta CPL by not reimbursing Plaintiff for the actual losses incurred by Plaintiff as a result of NHPA's fraud and/or dishonesty and/or breach of the Closing Instructions, as set forth above.

94. As a direct and proximate result of these material breaches, Plaintiff has suffered damages, including a severely under-secured mortgage loan from which only a fraction of the Loan debt could be recovered through loss mitigation attempts.

WHEREFORE, Plaintiff, Federal Deposit Insurance Corporation as Receiver for IndyMac Bank, F.S.B. respectfully requests that the Court enter judgment in its favor awarding it damages, costs, attorney's fees, and such other relief this Court deems proper against Defendant ATIF.

DATED: July 8, 2014

By: /s/ *signature*
Michael Jay Rune II, Esq.
Florida Bar No. 86355
mrune@welbaum.com
Robert A. Hingston, Esq.
Florida Bar No. 181185
rhingston@welbaum.com
Lindsey F. Thurswell, Esq.
Florida Bar No. 84747
lthurswell@welbaum.com
George T. Breur, Esq.
Florida Bar No. 33283
gbreur@welbaum.com
WELBAUM GUERNSEY
Attorneys at Law
*Counsel for Plaintiff FDIC*
901 Ponce De Leon Boulevard
Penthouse Suite
Miami, Florida 33134-3073
Telephone: 305.441.8900
Facsimile: 305.441.2255